# THE BALTIMORE & OHIO RAILROAD COMPANY *vs.* JOHN WHITEHILL.

*Carriers—Delay in Transportation—Reasonable Diligence—Unforeseen Difficulties—Failure to Furnish Cars After Notice—Cattle Designed for a Certain Market Day—Knowledge of Carrier—Evidence—Measure of Damages—Claim for Damages in Declaration—Instructions—Evidence of Contract Limiting Carrier's Liability.*

The common law duty of a carrier of live stock is to transport the same within a reasonable time, having due respect to the circumstances of the case, and, in the absence of an express contract, the carrier is liable for a delay in the transportation, which could have been avoided by the exercise of reasonable precautions.

When reasonable notice is given of the time and place when freight will be tendered to a railroad for transportation, the carrier is liable for a negligent failure to provide the means of transportation.

If a shipper gives due notice that two cars will be required for the transportation of cattle on a day named, and two cars are sent to the shipping point but one of them is afterwards diverted by the carrier to another purpose and its place not supplied until several hours later, in consequence of which delay the cattle fail to arrive in time for the market day for which they were designed, and for which the carrier knew they were designed, it is *prima facie* evidence of negligence on the part of the carrier.

When there has been a delay in the transportation of freight by the carrier, beyond the usual time, it is not necessary for the shipper to prove that the delay resulted from some independent, specific act of negligence on the part of the carrier.

When the delay in the delivery of freight is caused by unusual and unforeseen circumstances and not by negligence, the carrier is excused.

If a carrier knows, or may reasonably infer from the circumstances of the case, that cattle delivered to it for transportation is designed for a certain market on a certain day, the carrier is liable for neglect to exercise due care to provide the means of transportation after proper notice, and to carry the cattle with reasonable diligence, so that they may reach the market in time. In such case, it is not necessary to prove a direct communication to the carrier of the fact that the cattle were intended for the market, but that knowledge may be inferred from the circumstances of the case.

The plaintiff delivered to the defendant railroad company, a quantity of

cattle to be transported to a stock yard market, after having given no-
tice of the cars required. The market for cattle was held on only one
day of the week, and was over at 10 o'clock on the morning of that
day. The cattle were delivered to the carrier on the morning of the
day before at points from which the time usually required for transpor-
tation was about five hours. One of the cars sent on plaintiff's notice
was diverted to other uses. The cattle were not delivered until after
the close of the market, and the plaintiff sued to recover damages
caused by the delay. *Held*, That evidence is admissible to show that
the defendant knew, or might have reasonably inferred, that the cattle
were intended for sale at the market to be held on that certain day.

*Held*, further, that evidence is admissible to show the time usually taken
by the defendant to transport cattle from the shipping points to the
market, so as to compare that time with the time taken in the present
case, and thus determine whether the transportation had been effected
within a reasonable time.

When a carrier is guilty of a negligent delay in the transportation of cat-
tle intended for sale at a certain market, the measure of damages is the
difference between the market value of the cattle at the time when
they should have been delivered if due dispatch had been exercised,
and their value at the time when they were actually delivered.

A prayer offered by the defendant asserting that there was no evidence
to show that said cattle was not sold in open market was properly
rejected, because there was no question in the case as to open market.

Since the plaintiff's evidence shows that the cattle were not actually de-
livered so as to be within his control in time for the market, and that
he suffered a loss, by reason thereof, prayers offered by the defendant
instructing the jury that there is no evidence to show that the cattle
did not arrive in time for the market, and that the plaintiff is only en-
titled to nominal damages were properly refused.

A declaration containing five counts, charging the defendant railroad with
negligence in failing to transport cattle within reasonable time in differ-
ent cars, as set out in the respective counts, concluded with the aver-
ment, whereby on each of said several occasions, the cattle failed to
reach the destination in time for the market, and then followed a claim
for damages. The fifth count was afterwards struck out. *Held*, That
the above mentioned concluding averment was not a part of the fifth
count only, but the damages therein claimed related to each of the
counts, and it is unnecessary to insert the claim for damages at the end
of each count of the declaration.

When a part of the answer of a witness is competent evidence and a part
is irrelevant, a motion to strike out the whole answer is properly over-
ruled.

When the measure of damages is correctly stated in a prayer granted
upon the request of the plaintiff, it is not error to refuse to repeat the
same rule at the request of the defendant in another prayer.

If it is the custom of a railway company to charge a certain rate for the transportation of cattle when the shipper agrees that the company shall not be liable for loss sustained by any unusual delay in the transportation beyond the amount actually expended by the shipper for food and water for said cattle when so detained, and to charge a higher rate when no such agreement is made, then if the shipper agrees to pay and does pay, the lower rate for his cattle and the condition upon which such lower rate was charged was known to the shipper, he is not entitled to recover damages for the depreciation in the value of his cattle because delivered too late for a certain market day. But in such case, the burden of proof is upon the defendant to show that the plaintiff knew at the time of shipping his cattle that the rate charged was based upon such condition.

*Decided November 2nd, 1906.*

Appeal from Circuit Court for Carroll County (THOMAS, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Plaintiff's 4th Prayer as Modified by the Court:*    That if under the pleadings and evidence in this case the jury shall find that on the 7th day of December, 1903, the plaintiff delivered to and the defendant accepted forty-eight head of cattle belonging to the plaintiff to be carried from said Barnesville and Boyds Stations over the defendant's road and delivered to Union Stock Yards for him, it thereupon became the duty of the defendant to carry and deliver said forty-eight head of cattle with all reasonable dispatch to the plaintiff at said Union Stock Yards; and if the jury shall find, that the defendant did not carry said forty-eight head of cattle to said Union Stock Yards and deliver the same to the plaintiff within the time which it could have delivered them, using all reasonable exertion and taking all reasonable precaution to avoid delay; and shall further find, that the defendant knew, or from the circumstances of this case and the course of its trade and business it might have reasonably inferred, that the cattle were intended for sale at the market held at said Union Stock Yards on the 8th day of December, 1903; and shall further find that said cattle were delivered to the plaintiff too late for said

market, then the verdict of the jury must be for the plaintiff,
and they may embrace in their verdict any loss which they
may find to have been sustained by the plaintiff from decline
in the market between the time when said cattle could have
been delivered to the plaintiff, if they had been transported
with due dispatch, and the time when they were actually de-
livered to the plaintiff.    (*Granted.*)

*Plaintiff's 5th Prayer as Modified by Court.*—That, if under
the pleadings and evidence in this case, the jury shall find that
on the morning of the 7th day of December, 1903, about the
hour of 10 o'clock, A. M., the plaintiff tendered to the de-
fendant at Barnesville twenty-four head of cattle belonging to
the plaintiff to be carried from said Barnesville over the de-
fendant's road and delivered to the plaintiff at the Union Stock
Yards for hire, and shall further find that notice had pre-
viously been given to the defendant by the plaintiff, that the
plaintiff would deliver to the defendant at Barnesville at 10
A. M., on December 7th, 1903, said cattle to be so carried
and delivered by the defendant and shall further find that said
notice reasonably sufficient under all the circumstances of this
case to enable it by the exercise of due care and diligence to
provide means of transportation for said cattle at that time
from said Barnesville to the Union Stock Yards as aforesaid,
and shall further find that the defendant negligently failed to
furnish means of transportation for said cattle until between
the hours of 12 o'clock and 1 o'clock of the night of said 7th
day of December, and shall further find that in consequence
of the failure to furnish said means of transportation as afore-
said, said cattle failed to reach said Union Stock Yards until
between 12 and 1 o'clock of the 8th day of December, 1903,
and were not delivered to the plaintiff until after the market
held there on said 8th day of December was over, and shall
further find that the defendant knew or from the circumstances
of the case and the course of its trade and business, it might
have reasonably inferred, that said cattle were intended for
sale at said market, then the verdict of the jury must be for
the plaintiff, and they may embrace in their verdict any loss

which they may find to have been sustained by the plaintiff from decline in the market value of said cattle between the time when said cattle could have been sold if means for transportation had been furnished by the defendant with due diligence, and said cattle had been transported with reasonable dispatch, and the time when they were actually delivered to the plaintiff.    (*Granted.*)

*Plaintiff's 9th Prayer as Modified.*—That the burden of proof is upon the defendant to show that the plaintiff knew at the time he shipped the cattle mentioned in this case the rates charged by the defendant and the conditions under which the defendant charged nine cents per hundred and that at the time of said shipment he agreed to ship at said rate of nine cents per hundred.    (*Granted.*)

*Defendant's 33rd Prayer as Modified.*—That if after taking into consideration and having regard to the shipment of the stock mentioned in evidence by the local freight train described in evidence; the means of transportation in the defendant's power when the said three car loads of cattle mentioned in evidence were received by the defendant for transportation from Barnesville and Boyds to Claremont; the state of the weather, and the condition and amount of travel over the railroad of the defendant between Barnesville and Boyds and Claremont at the time of the transportation of said cars by the defendant; and, also, the situation at Claremont on the arrival of the two cars mentioned in evidence as Nos. 11751 and 11960 and all the other circumstances of the case, the jury shall find that the defendant company used reasonable diligence in forwarding and transporting the plaintiff's stock in said cars, then the plaintiff is not entitled to recover for any loss sustained by him on his cattle in said cars. (*Granted.*)

*Defendant's 35th Prayer as Modified.*—That if the jury shall find from the evidence that on or about the 7th day of December, 1903, the plaintiff shipped two car loads of cattle from a station on the road of the defendant called Barnesville by the road of the defendant for Claremont as testified to in evidence; and also, on or about the 7th of December, 1903,

shipped one car load of cattle from a station on the road of the defendant called Boyds by the road of the defendant for Claremont as testified to in evidence; and shall further find that the plaintiff shipped or carried his said cattle in said cars under the rate of nine cents per hundred pounds as testified to in evidence; and shall further find that said tariff or rate of nine cents per hundred pounds was charged by the defendant company only when the shipper of the live stock agrees to accept as full compensation for all loss or damage sustained by said shipper on account of any unusual delay or detention of said live stock in transportation on the railroad of the defendant company caused by the negligence of the said defendant company, or its employees and servants, the amount actually expended by the said shipper in the purchase of food or water for the said live stock while so detained; and that when said shipper does not so agree with the said defendant company he is charged the higher rate of eleven cents per hundred pounds for said cattle or live stock as testified to in evidence, if the jury so find; and shall further find that the said plaintiff for said three car loads of cattle did not pay the said higher rate of eleven cents per hundred pounds for said cattle to the defendant company, but that the plaintiff at the time of the delivery to the defendant of the three car loads of cattle agreed to pay to the defendant, and afterwards did pay to the defendant the lower rate of nine cents per hundred for the transportation of said cattle from said Boyds and Barnesville to Claremont; and that said rates and said lower rate and the said conditions upon which said lower rate was charged were known to the plaintiff at the time he shipped his said three car loads of cattle, then the plaintiff is not entitled to recover in this cause for any usual delay or detention of said live stock or cattle from the time of their delivery at Boyds and Barnesville to the defendant company for transportation on its railroad to the time of said stock being delivered to the plaintiff at Claremont by the defendant company. (*Granted.*)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Jas. A. C. Bond* and *Francis Neal Parke*, for the appellant.

*Guy W. Steele* and *D. Princeton Buckey*, for the appellee.

PEARCE, J., delivered the opinion of the Court.

The appellee, John Whitehill, sued the appellant, the Baltimore and Ohio Railroad, a common carrier, to recover damages alleged to have been sustained by the plaintiff by reason of the defendant's delay in the transportation and delivery of certain cattle of the plaintiff shipped over defendant's road to the Union Stock Yards in Baltimore, to be sold at the cattle market held there.

The declaration contained five counts, of which the first alleged that on December 7th, 1903, about 10 o'clock A. M. plaintiff delivered to defendant twenty-six head of cattle at Barnesville, in Montgomery county, to be by it carried for hire, with reasonable dispatch, from Barnesville to the Union Stock Yards in Baltimore City, and there to be delivered to the plaintiff; that a reasonable time for carrying said cattle from Barnesville to the Union Stock Yards was about five hours, but that the defendant negligently and carelessly detained said cattle on its road for an unreasonable length of time, to-wit, from the hour of delivery before stated, to the hour of ten o'clock A. M. on the following day, when they were delivered to the plaintiff. These cattle were shipped in car No. 11751.

The second count alleged, in precisely similar language, the delivery at Barnesville by the plaintiff to the defendant, on December 7th, 1903, at 10 o'clock A. M. of twenty-four other cattle to be carried to said Union Stock Yards, and their negligent detention upon defendant's road until noon on the following day, when they were delivered to the plaintiff. These cattle were shipped in car No. 11822.

The third count related to the same cattle mentioned in the second count. It alleges that these cattle were tendered for transportation, for hire, from Barnesville to the Union Stock Yards at 10 o'clock A. M. on December 7th, 1903, that be-

ing a reasonable hour for that purpose, after giving notice to defendant's agent on December 4th, 1903, that said cattle would be so tendered, in order that defendant should have reasonable time to provide the means of transportation, but that defendant negligently failed and refused to receive and carry said cattle, from 10 o'clock A. M. on December 7th, 1903, until 11 o'clock P. M. on the same day, and did not deliver them to the plaintiff at the Union Stock Yards until noon on December 8th, 1903.

The fourth count is the same as the first, except that it relates to a shipment of twenty-four other cattle from Boyds Station in Montgomery County to said Union Stock Yards, these cattle being shipped in car No. 11960.

The fifth count also is the same as the first except that it relates to a shipment of still other twenty-four cattle from Germantown Station in Montgomery County to said Union Stock Yards at 10 o'clock A. M., December 14th, 1903, these cattle being shipped in car No. 9189, and not being delivered to plaintiff until noon of the day following.

The declaration then concludes as follows:

"Whereby, on each of said several occasions by reason of the premises, said cattle failed to reach the said Union Stock Yards in time for the market on the respective days of delivery; a large shrinkage took place in the weight of said cattle, a deterioration in their condition and value; the plaintiff lost the profit he would otherwise have made by a sale of said cattle at the markets held at the Union Stock Yards on each of said respective days of delivery of said cattle, and the benefit of the expense incurred by him in traveling thereto, and preparing for a sale of said cattle thereat, and also lost the advantage of the expense of feeding and caring for said cattle, and other losses were then and there occasioned to the plaintiff in consequence thereof.

"And the plaintiff claims therefore $1,000 damages."

The fifth count was stricken out during the course of the trial, it appearing in the evidence that the cattle mentioned therein had been shipped under what is known as "The Uni-

form Stock Contract," under which a lower rate of freight is charged, in consideration of which the carrier is exonerated from damages for negligent delay, beyond the actual expense incurred in feeding and watering the cattle during the detention; and it also appearing that plaintiff had sold these cattle, to arrive at the Stock Yards.

The defendant demurred to each and every count of the declaration, and its demurrer being overruled, it filed the general issue plea, upon which the case went to trial, resulting in a verdict and judgment for plaintiff for $375, from which this appeal was taken.

During the course of the trial, nineteen exceptions were taken by defendant to the admission of testimony.

The plaintiff offered nine prayers, and the defendant offered thirty-eight.

The plaintiff's fourth, fifth and ninth prayers were modified by the Court and granted as modified, and all his other prayers were rejected.

The defendant's thirty-first and thirty-third prayers were modified by the Court, and granted as modified, and its thirty-fifth prayer was modified by the Court, and, as modified, was granted in connection with plaintiff's fourth and fifth granted prayers, and all the other prayers of defendant were rejected.

The defendant's 20th exception was taken to the rulings on the prayers, but the exception to the rejection of defendant's 2nd, 3rd, 4th, 7th, 9th, 11th, 14th, 16th, 17th, 18th, 19th, 20th, 21st, 24th, 32nd, 34th and 36th prayers were afterwards abandoned and these are not embraced in the record.

The first question presented is raised by the demurrer to the declaration. The first, second and fourth counts allege that it was the duty of the defendant to transport and deliver the cattle received by it, within a reasonable time thereafter, and they charge a negligent breach of this duty. These counts are founded upon the common law duty and liability of the defendant as a common carrier of live stock, and not upon any special contract between the parties. What this duty and liability is, has been declared in this State in *P., W. & B. R.*

*Co.* v. *Lehman*, 56 Md, 209, in which the Court said: "In the absence of an express contract, the common law duty and liability of a common carrier, for the safe carriage and due delivery of live animals, are the same as that for the carriage and delivery of other property, the liability in all cases being qualified by the nature and inherent tendencies of the thing carried. In undertaking the carriage of live stock, therefore, the carrier assumes the obligation to deliver safely, *and within a reasonable time,* having due respect to the circumstances of the case." In view of this language it cannot, therefore, be questioned that these counts, in respect to the allegation of duty and breach, each state a good cause of action.

The third count alleges that it was the duty of the defendant to receive for transportation the cattle mentioned therein, and tendered it for that purpose, upon reasonable notice of the time and place where such tender would be made, and it charges a negligent failure and refusal to provide means of transportation and to receive said cattle, after such reasonable notice has been given, towit, three days previously. In 6th *Cyc.*, 372, it is said: "A railroad company engaged in the business of transporting freight as a common carrier, is bound to furnish suitable cars as required by customers, upon reasonable notice (and in the order of application made) whenever it can do so without jeopardizing its other business." The cases sustaining this statement of the law are numerous, and the principle is recognized in Lehman's case, *supra,* in which the Court, speaking of the duty to receive and forward cattle from a connecting railroad, said: "If the defendant provided reasonable *equipment* to meet the requirement of the Sunday's transportation, in the usual course, *upon the notice received,* and the plaintiff's cattle were carried forward and delivered with due diligence, and as much expedition as was practical under the circumstances of the case, the defendant is not liable for the consequences of the unavoidable delay. But, on the other hand, if the delay could have been avoided, by the use of due diligence, and the making of proper effort to send forward the cattle with ready and convenient dispatch, and injury

resulted from a failure in that respect, the defendant is liable therefor."

It has been stated that the fifth count was stricken out, and it was further contended by the appellant, that the clause in the declaration which has been herein transcribed in full, and in which is set out the several items of loss sustained, and the amount of damages claimed, was a part of the fifth count stricken out, and that this invalidated the whole declaration.

In 13th *Cyc.*, 195, the law is thus stated: "It is unnecessary to insert a claim for damages at the end of each count or paragraph of the complaint.   It is sufficient to state the amount demanded at the conclusion thereof."   In this case, not only was this sensible rule complied with, but it is clear that the clause in question cannot, either logically or grammatically, be regarded as constituting a part of the count stricken out, for it expressly says, "Whereby, *on each of said several occasions*, by reason of the premises, said cattle failed to reach the Union Stock Yards in time for the market on the respective days of delivery," thus distinctly connecting the loss sustained and the damages claimed, with the negligence alleged in *each* of the counts in the declaration.

It follows therefore that the demurrer was properly overruled.

The numerous exceptions to the admission of testimony were little discussed by the appellant either in the brief or in the oral argument, both of which were mainly directed to the ruling upon the prayers.   Many of these exceptions however, in fact, involve the same principles applicable to the prayers, and for their consideration it will be necessary to set forth briefly the substance of the testimony which was admitted.

The plaintiff testified that he had been shipping cattle for sale for thirty-five years, and for the last eight years over the B. & O. Railroad from Boyds and Barnesville to the Union Stock Yards at Claremont near Baltimore; that these two stations are respectively about 65 and 70 miles from the Union Stock Yards which are the only stock yards in Baltimore, and that Germantown is about six miles nearer than Boyds.   That there is only one market day in each week at these yards, as

fixed by the president of the yards, and in December, 1903, Tuesday, was the market day; that the rule of shippers of stock from those stations, and his own invariable custom, was to order his cars to be ready for loading the morning of the day before the market day and to load on the day before the market day; that Mr. Wilson, the live stock agent for the B. & O. R. Co., told him to load his stock for the market at the Union Stock Yards for the way freight train; that this way freight usually came to Barnesville about 11 o'clock, A. M., sometimes, 12 or 1 o'clock; that the time required for transporting cattle by that train varied at times, but the ordinary time was about six hours without any trouble unless there was some delay or something in the way, and that he had made the trip on that train in six hours; that he ordered two cars from the agent at Barnesville, Mr. Darby, on December 4th, 1903, in time to load on Monday the 7th for the way freight, and they were sent, but on Monday one of these cars was gone, and Mr. Darby told him that D. O. had telegraphed him to let Mr. Titus have one of these cars and another would be sent him in time; that he loaded the remaining car that morning and left for Hagerstown at 5.12 that afternoon when the other car had not arrived; that on reaching Baltimore he went to see Mr. Galloway, the freight agent or superintendent, who told him he forgot all about the other car; that one car from Barnesville and one from Boyds arrived at the stock yards between 9 and 10 A. M., December 8th; that the other car from Barnesville did not arrive at the stock yards until after noon on December 8th; that the market always was held early in the morning, and the weighing commenced that morning about 6 o'clock, and the market was over about 8 o'clock and never lasted longer than 10 or 11 o'clock; that he tried to get the buyers to come down from the hill where they sell to the butchers, to the pens where his cattle were, to buy them, but that he could only induce one man, Mr. Fox, to look at them, and that he sold them to him at private sale for 4¼ cents, though such cattle sold readlly at the market that day for 4½ and 4¾ c, but that 4¼ was the

best price he could get, as the buyers were gone when his cattle were delivered, and there was no market for them.   He said that when he shipped stock from Germantown he had always signed a contract similar to the uniform live stock contract shown him, but never read one, and never signed any contract for shipments from Boyds or Barnesville; and that in ordering cars and shipping stock he always told the agent where the stock was to go for sale.

W. B. White testified that he had loaded stock at Barnesville for plaintiff for four or five years, and that they always loaded for the market at the Union Stock Yards, the day before the market day, and that on December 7th, they were one car short on their order, as one of theirs had been diverted for Mr. Titus; that he kept on trying until he got the car replaced, and it was loaded down between 12 and one o'clock at night December 7th.

Lambert, conductor of the Metropolitan Branch of the B. & O. R. Co., testified for defendant, that on December 7th, he took the two cars, Nos. 11751 and 11960 from Barnesville to Washington, 30 miles reaching there at 10.50 P. M.   That his run is from Washington to the junction and return; leaving Washington at 5.30 A. M. and due on return at 3.10 P. M.; that if the work is light they can make the schedule, but cannot if it is heavy, and it was then very heavy; that this is not unusual and it is always heavy at that season; that the schedule is fixed for the usual time it takes to make the trip, and that on that day he kept the train moving whenever he had a chance to get out of the way of the passenger trains.

Ross, conductor of way freight from Washington to Claremont, testified that on December 8th he moved these two cars from Washington to Claremont, leaving at 1.33 A. M and reaching Claremont between 6 and 7 A. M., a distance of 38 miles, but did not place them at the pens for delivery of stock; that there is no schedule for way freight trains on that branch.  It moves whenever it can, and never stands still unless it is impossible to move.

Loch, another conductor, on the Metropolitan Branch, testi-

fied that he took car No. 11882 from Barnesville at 12.18, December 8th, and delivered it at Washington at 8.20 A. M.; that the rnn of 30 miles that night took about eight hours, being delayed in doing extra work by defendant's orders.

Hudson, another conductor, testified that he moved car No. 11882 from Washington to Claremont, leaving Washington at 8.20 A. M. and delivering the car at Claremont at 12.50 P. M. Could not leave earlier on account of first-class passenger trains, and moved as quickly as possible.

Santman, station agent at Germantown, said the schedule of the way freight at that point was 1.15 P. M., but in December, 1903, it was usually from one to three hours late and always is at that season on account of Christmas goods. He also said plaintiff always signed uniform live stock contract at that station, but he could not say he understood it.

Higgins, station agent at Boyds, said plaintiff loaded cattle on a car there on December 7th about 1 P. M. and the way freight moved it at 5 P. M. same day. He thought plaintiff when shipping there, signed uniform contract, but could not say, as he had no records.

Jameson, acting agent at Barnesville in 1903, said plaintiff usually shipped one car a week there from May to December, and usually signed a contract similar to the uniform contract shown him; and the rate charged him was nine cents. Plaintiff did not say anything in regard to shipping for market, but the cattle were usually shipped to Claremont which is the station, and witness knew cattle were sold there.

C. W. Galloway, an employee of defendant for 23 years, and superintendent of Baltimore Division said there was no schedule for the way freight on that division. That local freights are supposed to get out of the way of all other trains, whether they make their runs in two or twenty-two hours, and that he considered twelve hours good time for local shipment of stock from Barnesville to Claremont.

Charles W. Pledge, agent at Claremont, said that station was commonly called Union Stock Yards; that on December 8th, 1903, two cars were brought in for plaintiff and were

placed at the pens at 9.30 A. M., and that they were not placed sooner on account of the congested condition of the yard. Later on, he said these cars were placed at 10.30, and that the third car of plaintiff came in at 12.50, that 16 cars of cattle came in that day from the Valley of Virginia, of which four were for the north, and the other 12 were sold on the market at .10.30, but he did not know how much loss there was on the Virginia cattle.  A copy of the uniform live stock contract referred to in the evidence was offered and is set out in the record.

We have carefully read and considered the brief of the appellant, and examined the cases referred to by him as sustaining the propositions of law upon which he relies, which may be thus stated.

1st. That to establish negligence, mere delay is not sufficient, but the delay must be proved to have resulted from some independent specific act of negligence;

2nd. That knowledge by defendant that the cattle in question were intended for delivery and sale on the Tuesday morning market at the Union Stock Yards could only be shown by direct and positive evidence of the communication of that fact to defendant, and could not be inferred from the facts and circumstances in the case.

Upon these two propositions the appellant founds its whole argument upon the exceptions to the testimony and to the ruling upon the prayers, but we are of opinion that the law in Maryland has been otherwise settled, upon both propositions in *Lehman's case, supra,* and under the first proposition, not only with respect to the alleged unreasonable delay in carrying the two car loads for which cars were furnished according to notice, but also with respect to the cattle delayed by the failure to furnish the car according to notice.

In *Lehman's case, supra,* p. 233, the Court said, "If the plaintiff's cattle were carried forward and delivered with due diligence and as much expedition as was practicable, under the circumstances of the case, the defendant is not liable for the consequences of the unavoidable delay; that is to say, a

delay that could not have been avoided by the exercise of reasonable precaution and diligence.    But, on the other hand, if the delay could have been avoided by the use of due diligence, and the making of proper effort to send forward the cattle with ready and convenient dispatch, and injury resulted from a failure in that respect, the defendant is liable therefor. The duty to deliver safely and the duty to deliver in due time are distinct obligations.    The time of delivery is often a matter of express contract; but when, as in this case, there is no express contract, there is an implied obligation to deliver within a reasonable time, and that means the time within which the carrier can deliver, using all reasonable exertion, and taking all reasonable precaution to avoid delay.    That proposition would appear to be well settled upon undoubted authority. *Parsons* v. *Hardy*, 14 Wend. 215; *Taylor* v. *R. R. Co.*, L. R. 1 C. P. 385; *Story on Bailments*, sec. 545A; 1 *Parsons on Contracts*, 659, and cases there cited."    This is applicable especially to the two car loads for which cars were furnished according to notice and request.

Upon page 232 of the same case, in which the cattle there in question, were received by the defendant from a connecting road, the Court said: "The principal question here is, whether, according to the ordinary extent and usual course of the cattle trade on Sunday over the defendant's road, from Baltimore, and the notice given the defendant's agents of the approach of trains for transportation on Sunday, the 28th of July, the defendant had made reasonable provision, and exerted due care and diligence, to guard against delay in forwarding the cattle trains that might be received from the B. & O. R. R. on that day; or whether upon receipt of such notice as was given, the requisite means or equipment could have been provided, by reasonable exertion, to take forward the plaintiff's cattle without the delay that actually occurred?    And this is a question that should have been submitted to the jury for their determination upon all the proof in the cause."    This is specially applicable to the cattle for which the car was not furnished ac-

cording to notice and request.   Again as to the proof of
knowledge that the cattle here in question were intended for
delivery at the early Tuesday morning market at the Union
Stock Yards.   The Court in the same case last cited on page
234 said: "As it is sought to charge the defendant with the
consequences of delay, and the failure to use such degree of
diligence as would have secured their arrival at Jersey City
in time for the cattle market of Monday, the 29th of July, it
is material and necessary that it should be shown that the de-
fendant had knowledge, or from the circumstances of the case,
and the course of the trade, it might have been reasonably
inferred, that the cattle were intended for the market of that
day."

Applying these principles we think there can be little diffi-
culty in disposing of the exceptions in this case.

But before proceeding to their consideration, we may re-
mark that we find the doctrine of Lehman's case to be in ac-
cord with the weight of opinion elsewhere, and that we can
not regard the cases cited by the appellant as sustaining his
position.

In *Thayer* v. *Burchard*, 99 Mass. 521, what was decided
was, that for losses and expenses arising from mere delay, oc-
casioned by a *temporary and unforeseen excess of business, and
without fault*, the carrier is not liable.

In *Wibert* v. *N. Y. and Erie R. R.*, 12 N. Y. 245, the Court
said: "Where the complaint is only of late delivery, the ques-
tion is simply one of reasonable dilligence, and *accident or
misfortune* will excuse the carrier, unless he has contracted to
deliver within a limited time."

In *Briddon* v. *G. N. R. W.*, 28 L. J. R. Exch. 51, it was
held that a carrier of goods or cattle is only bound to carry
in a reasonable time under ordinary circumstances, and is not
bound to extraordinary efforts to surmount obstructions *caused
by the act of God*.   And in *Empire Trans. Co.* v. *Wallace*, 68
Pa. St. 302, almost the same language was employed.

In *Taylor* v. *G. N. R. W.*, L. R., 1 C. P. 385, the carrier
was held excused by reason of an unavoidable obstruction,

viz., an accident resulting solely from the negligence of an-other company running over its line.

In so far as the citation from 5 *Current Law*, 528 may be held to sustain the appellant's contention, we cannot adopt or follow it.

It is obvious that the cases to which we have adverted do not, and were not designed to, conflict with the principles an-nounced in Lehman's case, and the authorities are abundant that the carrier is not relieved from liability by pressure of freight or other business unless it is extraordinary and unfore-seen. Thus in *Halliwell* v. *G. T. R. W.*, 7 Fed. Rep. 76, it was held that where delay is caused solely by an extraordinary and unforseen pressure of freight, and not by any negligence, the carrier will be excused, but otherwise if it could have been foreseen.

And so in *Faulkner* v. *So. Pac. R. R.*, 51 Mo. 34, it was said, "Where, by reason of unusual pressure of business, a railroad cannot deliver with dispatch, it may decline to receive freight without incurring liability; but where it is received and shipped, the carrier must forward without delay, or answer for damages caused thereby. See also the discussion under this head in 6th *Cyc.*, 444, 445, where the general doctrine is stated that as to any cause of delay which he might anticipate he should then advise the shipper, and if he does not do so the delay will not be excused.

Taking up the exceptions first, it will be seen that the 1st, 2nd, 3rd, 4th, 5th, 6th, 14th, 15th and 19th all relate to the proof of facts and circumstances tending to show that the de-fendant knew, or might reasonably have inferred that the cat-tle were intended for sale at the market held at Union Stock Yards on Wednesday, December 8th, 1903, and there was consequently no error in admitting such testimony. The 7th and 10th exceptions were taken to the admission of evidence to show the ordinary time taken by the railroad to transport cattle from Boyds and Barnesville to Union Stock Yards. The carrier being bound to deliver in reasonable time, there could be no better standard for determining what was reasonable

time, than comparison of the ordinary time taken, with that actually taken on that occasion. The jury had before it the testimony of both parties upon that question in connection with all the circumstances existing at that time, and from this drew their conclusions. No reasons need be adduced to sustain these rulings.

The 8th, 9th, 16th and 18th exceptions were taken to the admission of evidence to show that the defendant had reasonable and ample notice of demand for the car to be supplied at Barnesville on December 7th at 10 A. M., but which was not supplied until 11 P. M. of that day, and in consequence was not delivered until noon the following day at the Stock Yards, and it follows from what we have said in overruling the demurrer to the 3rd count of the declaration that this evidence was properly admitted.

The 11th, 12th and 17th exceptions are in reference to the loss sustained by the plaintiff, and the evidence was offered to show the difference in the market value of these cattle at the time the market of that morning was held, and at the time of their delivery after the market. The correctness of these rulings depends upon the rule as to the measure of damages in such cases.

In a similar case in Vermont, *King* v. *Woodbridge*, 34 Vt. 566, it was held that plaintiff could recover as damages the difference between what he was obliged to sell at when the sheep arrived, and what he would have received if they had been delivered in time for the market.

And in *Anthony* v. *G. T. R. W.*, 13 Allen, 381, JUDGE GRAY said: "The true rule and measure of damages whenever, by reason of unexplained or inexcused delay of the carrier, the goods are not delivered until after they have diminished in market value, is the amount of the diminution. This allows to the person injured, the value, as exactly as it can be estimated in money, of that of which he has been deprived by the wrongful act of the defendant."

And in Lehman's case, the Court approved an instruction that the jury might embrace in their verdict any loss sustained

by the plaintiff "from decline in the market value between the time when they could have been sold, if they had been transported with due dispatch, and the time when they were actually sold.',

There was no error therefore in the admission of this evidence. The thirteenth exception was taken to the refusal of the Court to strike out the answer of the plaintiff to the following question: "Were these the best prices?" meaning the prices obtained for the delayed cattle; to which the answer was, "Yes. He, Ecker, said he had no market for them." If the objection had been confined to the latter part of this answer, which was not responsive to the question, it should have been striken out, but as it went to the whole answer, the material part of which was responsive and was proper evidence, the motion was correctly refused.

This brings us to the ruling on the prayers.

The defendant's 1st, 15th, 25th and 26th prayers demur to the evidence on the ground that there is no evidence legally sufficient to show negligence under any of the counts in the declaration, and the 15th also puts the burden of proof of negligence upon the plaintiff. The 27th demurs to the evidence offered under the 3rd count—the 28th to that under the 1st count; the 29th to that under the 2nd count, and the 30th to that under the 4th count. It follows from what we have said as to the defendant's two propositions of law, and as to the various exceptions, that all these prayers were properly rejected. It is true that the burden of proof is on plaintiff to show negligence; that is in this case, negligent or unreasonable delay, but the 15th prayer also directed the jury that there was no legally sufficient evidence of *any* negligence or delay, and in that shape the prayer could not have been properly granted. The defendant's fifth prayer demurred to the evidence on the ground that under the pleadings in this case the plaintiff could not recover for delay in not supplying the car at Barnesville after notice three days previously. We have said the carrier is bound for negligence in not supplying cars on due demand and notice, in the absence of some controlling excuse, and in

this case there was not only no excuse, but the evidence showed that the defendant diverted the car originally sent to plaintiff, and afterwards forgot to replace it. There was no error in rejecting this prayer.

The 6th and 10th prayers of defendant sought to instruct the jury that there was no evidence legally sufficient to show that the defendant accepted cattle to be transported to the market of December 8th, 1903, at Union Stock Yards, or to any market to be held at any certain time. But as we have said, this acceptance may be inferred from facts and circumstances, and these were ample in this case for that purpose. These prayers were properly rejected.

If the 8th prayer, which asserts that the only duty defendant owed plaintiff in this case was to carry the cattle with reasonable diligence, and avoid unnecessary delay in their delivery, had been confined to the 1st, 2nd and 4th counts, it is conceded by the appellee it would have been correct, but it embraced the 3rd count charging a negligent breach of duty to furnish cars on due notice, and it was correctly rejected.

The defendant's 12th prayer asserts there is no evidence legally sufficient to show that the cattle in cars Nos. 11751 and 11960 ware not sold in *open market* on December 8th, 1903, before 11:30 A. M. There is no question of *open market* in this case, and unexplained, that term would necessarily have confused and misled the jury. If by open market, was meant that the sale was made before the close of the regular market as held that day, the prayer should have been so framed as clearly to express that meaning. As offered it was properly rejected.

The defendant's 13th prayer denies the right to recover if the cattle were delivered at Claremont before the opening of the market on the morning of December 8th, 1903, but the evidence of both parties showed that delivery at the Stock Yards was not made until the cattle were in the language of the witness Pledge "placed at the pens," and that they have to be so placed by a switch engine; plaintiff testified that these two cars were not placed at the pens until between 9 and 10

o'clock that morning, and that they were not "*his cattle*" until they were in the pens, and Pledge himself said they were not placed until 9:30 A. M.

As there was no evidence in this case of any loss of weight, or expense incurred in feeding the cattle while detained, the defendant's 13th prayer correctly stated the rule for the measure of damages, but this rule was distinctly given in the plaintiff's 4th and 5th prayers as granted, and also in defendant's 31st prayer as modified and granted by the Court and there was no injury or error in refusing to repeat the rule in the defendant's 13th prayer.

The defendant's 23rd prayer limited the plaintiff's recovery to nominal damages under the whole declaration, and its 32½ prayer sought to impose the same limit as to the 1st and 2nd counts. But as there was proof of actual loss by reason of the detention of these cattle, the rejection of these prayers was correct.

The defendant's 31st prayer as offered was confused and contradictory in its terms and was properly rejected.

The defendant's 33rd prayer as offered related only to the cattle mentioned in the 1st, 2nd and 4th counts of the declaration, but concluded to the verdict on the whole declaration. The modification by the Court corrected this error only, and it was properly rejected as offered.

No reference is made in either brief, nor so far as we can remember in the oral argument, of any of the counsel to the defendant's rejected 37th prayer. The plaintiff denied that he had signed any live stock contract for shipments from Boyds or Barnesville. The station agent at Boyds, Mr. Higgins thought plaintiff had signed such contracts, but could not say. The agent at Barnesville, Mr. Jameson said plaintiff usually signed such contract but could not say he did so on December 7th, and none was produced. We may presume therefore this prayer was rejected for want of evidence to support it, and that appellant accepted this ruling as correct.

We are of opinion that the plaintiff's 4th and 5th granted prayers as modified by the Court correctly state the

law as applicable to the facts of the case, and that the plaintiff's ninth prayer as modified by the Court, placing upon the defendant the burden of proof to show that plaintiff knew at the time of these shipments, the rates charged and the conditions under which the nine cent rate was made, and that he agreed to ship at said rate, was properly granted.

We are of opinion that the whole law of the case was correctly given in the instructions granted upon both sides, and finding no error in the rejected or granted prayers, the judgment will be affirmed.

> *Judgment affirmed with costs above and below.*