NEWTON JONES *v.* ALABAMA & VICKSBURG RAILWAY CO.

1. RELEASE. *Personal injury. Fraud.*

Where plaintiff, an aged and ignorant negro, in less than twelve hours after amputation of his foot, which had been crushed by a train, is visited at his home by officials of the railroad company, and, while stupid from opiates and ignorant of what is transpiring, waking only when roused, and then suffering mentally and bodily from the shock, and, in the absence of any friend competent to advise him, is induced to sign a release of all damages, in consideration of $300, the release is fraudulent and void.

2. SAME. *Ratification. Evidence. Question for jury.*

In such case there being evidence that plaintiff knew nothing of the settlement for about two weeks, and, when told of it, at once said that, if he had been in his right mind, he would not have made it; that he then, as soon as possible, consulted trusted white friends, who, with his wife, shortly afterwards secured legal counsel; that he remained in bed about two months, and spent all the money paid him; but, several months afterward, through his attorneys, tendered the amount back to the company, it is for the jury to say whether he had ratified the release.

3. SAME. *Subsequent suit. Tender unnecessary.*

Where a release of damages for personal injuries is fraudulent and void, no tender of the sum paid therefor before suit is necessary, but the jury, in assessing damages, should make allowance for the sum paid.

4. RAILROADS. *Flying switches. Code 1892, § 3548, constitutional.*

Section 3548, code 1892, prohibiting running, flying, walking or kicking switches within the limits of a municipality, and making a railroad company liable for damages sustained thereby, without regard to contributory negligence of the person injured, is not unconstitutional as denying to the company the free use of its tracks, but is a legitimate exercise of police power.

FROM the circuit court of the first district of Hinds county. HON. J. B. CHRISMAN, Judge.

Action by Newton Jones against the Alabama & Vicksburg Railway Co., to recover damages for personal injuries.

The defendant pleaded, among other things, a release executed by plaintiff. The circumstances attending the execution of the release, as well as all the other facts necessary to an understanding of the cause, are stated in the opinion. It may be added that the tender referred to in the opinion was made in September following the injury in April. There was a peremptory instruction for the defendant; judgment accordingly, and plaintiff appeals.

Section 3548, code 1892, which the court holds to be a valid exercise of the police power of the state in the regulation of railroads, is as follows:

"It shall not be lawful for any railroad company, or other person, to switch a railroad car in the manner commonly known as a 'flying,' 'running,' 'walking,' or 'kicking' switch, within the limits of a municipality; and, in case of injury resulting to any person or property from switching in violation of this section, the railroad company shall be liable in damages, without regard to mere contributory negligence of the party injured."

*Williamson & Potter*, for appellant.

1. The injury was caused by a flying switch, in violation of § 3548, code 1892, and the company is therefore liable, regardless of mere contributory negligence of plaintiff.

2. The court below sustained the release in this case on the authority of *Railway Co.* v. *Turnbull*, 71 Miss., 1029. We fail to see the application of that case to this. In that case, the court held that the release could not be avoided upon the wholly insufficient evidence of fraud or misrepresentation found in the plaintiff's testimony. That case was not decided upon any preponderance of evidence. Under the facts of this case, a court of equity would not allow a contract between individuals in the ordinary affairs of life, and for such an insufficient con-

sideration, to stand. Had appellee, under the same circumstances, secured a deed to property for such an unfair consideration, would a court of equity sustain the deed? On the subject of the release, we refer the court to *Evans* v. *Llewellin*, 1 Cox Ch., 332; 1 Story Eq. Jur., §§ 119, 222; *Bean* v. *Railway Co.*, 107 N. C., 731. In the Turnbull case, this court emphasized the fact that Turnbull "did not rush into the settlement immediately after he was injured, nor did he precipitately accept an offer, but he had time for deliberation and for conference with others." Thus it is seen how different are the two cases. In view of the positive testimony of appellant and his wife, and the reasonableness of their statements, it was error to take the case from the jury.

3. No tender was necessary. 109 Ill., 131; 127 Mass., 86; 18 Kan., 58; *Evans* v. *Llewellin, supra;* 19 Am. & Eng. Ry. Cas., 220; 127 Mass., 86. However, in this case, a tender was in fact made.

*Nugent & McWillie*, for appellee.

1. It is conceded that appellant was guilty of contributory negligence, but he claims the benefit of § 3548, code 1892. What the statute means by the use of the terms "walking" switch, or "kicking" switch, we do not know. If it is intended that no car should be in motion at any time within the limits of a municipality unless there is a locomotive attached to it, it is singular that apt words should not be employed to show such intention. To say that a railroad company shall not, under any circumstances, make a flying switch, is to announce a proposition that cannot be harmonized with the general principles and policy of the law, and absolutely to deny such company the right to use its tracks and property in the manner most advantageous to itself and not hurtful to anyone who will exercise his sense of sight or hearing. The statute cannot be sustained as an exercise of police power. Such regulations, to be valid, must have reference to the comfort, safety or welfare

of society; they must not take from the corporation any of its essential rights and privileges conferred by its charter. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the charter franchises. Cooley on Con. Lim. (5th ed.), 712, 713. It is not competent to make a railroad company liable for injuries for which it is in no way responsible. 78 Ill., 55. The charter of appellee antedated the constitution of 1890, and by it appellee is invested with all powers necessary for the construction, repair, use and maintenance of its railroad. The statute does not even provide a rule of comparative negligence, but of absolute liability, and is therefore not warranted by the laws of this state. *Railroad Co.* v. *McGowan*, 62 Miss., 682; *Railroad Co.* v. *Bourgeois*, 66 *Ib.*, 3; 58 Ala., 594.

2. The release is an absolute bar. On the trial plaintiff swore he did not make the settlement or sign the release at all, and in this his pliant wife corroborates him. But there is no plea of *non est factum*, and so the evidence amounted to nothing. Plaintiff admits that, in a short while, the effects of the morphine were dissipated, and he was made aware of what he had done, and, while fully conscious of the effect of the release, he retained and used the money. He did not promptly disavow the contract and offer to return the money. Such retention was an acquiescence. 44 Am. & Eng. R. R. Cas., 488; 1 *Ib.*, 302. The tender of the money was made only for the purpose of bringing the suit. There must be clear and indisputable evidence of fraud to warrant the submission of the question of its existence to the jury. *Railroad Co.* v. *Turnbull*, 71 Miss., 1029; *Railroad Co.* v. *Shay*, 82 Penn., 198; 12 Atl. Rep., 78.

Argued orally by *W. H. Potter*, for appellant, and *T. A. McWillie*, for appellee.

WHITFIELD, J., delivered the opinion of the court.

The circumstances under which the release was executed by appellant, as shown by his and his wife's testimony in the rec-

ord, were as follows: The appellant was lying in his bed the morning after his foot had been amputated, under the influence of opiates administered by his wife the night before. He was stupid, sleeping, waking when roused, and going back to sleep again, knowing himself nothing whatever as to the execution of the release, or what transpired at the time, suffering bodily and mentally from the shock of the injuries, and the amputation made less than twelve hours previously. His name and his wife's were written by the railroad officials, and signed by them to the release, and their cross-marks made, and they then touched the pen. This was in the morning, before breakfast. It was witnessed by Dr. Page, a witness for the appellee, Mr. Kretz, and Mr. Stevenson, employes of the appellee, and by a colored girl named Owens, whose name was written as appellant's had been, she touching the pen. Not a solitary friend of the appellant, competent to advise, was present. He had been injured on April 13, his foot had been amputated on the fourteenth, and this release was executed about six or seven o'clock on the morning of the fifteenth, in less than twelve hours after the amputation. His wife had given him at least two doses of some opiate that had been left by some of the doctors during the night preceding the amputation. When Stevenson came into the room where appellant was in bed, in the stupid, sleeping condition the testimony of appellant and his wife have thus described, Newton says: "He shook hands with me. I thought it was some young man that had been in the army. I met up with them quite frequently. I thought he was one of them. I don't know who he is. I don't know that I ever saw him before. I intended to ask him who he was." Describing the effect of the opiate upon him, he says: "It appeared to him like a dream when he got up. He thought it was night."

In the evening of the same day, about two o'clock, Kretz came back and brought another release, which was signed and witnessed in the same way, except that the girl, Owens, did not attest it. In the morning $50 had been paid, and a due

bill for $250, payable April 17, two days later, given.    In the
evening this due bill was taken up by the debtor, two days in
advance, and $250 paid.    The money was put on the bed, the
wife took it and put it away, and the husband knew nothing
whatever about it, or about the settlement at all, until told by
his wife, she supposes a week or two later.    This is the scene—
these the *dramatis personæ*.    Is anything more than its naked
statement needed to shock the conscience?    There is a fitter
place for the execution of such a release than the sick room of
the sufferer, and a fitter time than a period following, by less
than twelve hours, the amputation of his foot.    Unhesitatingly
we join the Illinois supreme court in pronouncing this "indecent
haste" (109 Ill., 120), and declaring that this release, if thus
obtained, is an absolute nullity.    Courts do not sit to sanction
such travesties of contract.    An aged negro, with the degree
of intelligence shown by the record, situated as he was, dealt
with as he was, cannot thus be overreached.    It must be care-
fully borne in mind that we are speaking now of the propriety
of the peremptory charge, and speaking of that in the light of
the testimony of appellant and his wife alone.    If what they
say is true, this release is utterly void, and whether it was true
was a question of fact for the jury.

We are abundantly supported by authority—if any were
needed—in declaring the release void, if this testimony be true.
In *Evans* v. *Llewellin*, 1 Cox's Cases, 333, a husband who had
no interest in lands, a moiety of which had belonged to his wife,
claiming under a void will of the wife, believed by him to be
valid, was informed by his solicitor, when offering to sell the
same, that the title was in his deceased wife's brothers, who
were living in London, "in very mean circumstances, as jour-
neymen in different trades."    On August 20, 1785, the hus-
band and his solicitor, and a friend of the husband's, Llewellin,
met one of these brothers by Llewellin's appointment.    The
whole situation was fully explained to him.    He expressed him-
self perfectly satisfied; said he knew it was his sister's inten-

tion that Llewellen should have the property, as manifested by her will, and agreed to execute a release for two hundred guineas. He was urged by Llewellin to see and consult his friends and his wife before making the agreement, but he refused to do so. On August 23 he executed the release, and received the money. On September 27, the other brother and the one first dealt with, again, after full explanation, affirmed the release, the other brother executing a memorandum, and, on September 30, both executed a second release. After all this—facts making a far stronger case than this—the court said: "It has been truly argued that no facts were, in this case, kept back from the party, no false recitals in the deed, but that all the instruments contained a full discovery of the facts upon which the plaintiff was to make his bargain, notwithstanding which, I am of opinion that this agreement ought not to stand. I lay great stress upon the situation of the parties to it, and the persons who compose the drama." And, then, after a summing up of the evidence, the court proceeded: "I am called on for principles upon which I decide this case, but where there are many members of a case, it is not always easy to lay down a principle upon which to rely. However, here I say the party was taken by surprise; he had not sufficient time to act with caution, and, therefore, though there was no actual fraud, it is something like fraud, for an undue advantage was taken of his situation. The case of infants dealing with guardians, of sons with fathers, all proceed on the same general principle, and establish this, that if the party is in a situation in which he is not a free agent, and is not equal to protecting himself, this court will protect him."

Again: "It is said he was cautioned. It is true, and so far the parties did right; but they ought to have gone farther; they should not have permitted the man to have made the bargain without going to consult his friends. There was not sufficient *locus pœnitentiæ;* there was no person present to give him advice; he was entirely in their hands, and surprised at

this unexpected acquisition of fortune." How all this fits in here!

This case was decided in A.D. 1787, but the principle is immutable and eternal; and the precise point was adjudged the same way by the supreme court of North Carolina in A.D. 1890, in *Bean* v. *Railroad*, 107 N. C., 731. The injuries there were inflicted November 25; the release was executed December 18. The Court say: "The reply to the answer does not expressly allege that the release in question was obtained from the plaintiff by the fraud of the defendant or its agents, but it does allege . . . that it was obtained by the defendant under such circumstances of unfairness, undue advantage, inadequacy of consideration, suddenness, while the plaintiff was suffering great pain and mental anxiety, while he was ignorant and unable to comprehend the meaning and purpose of such an instrument—under such circumstances of mistake and surprise as that the court . . . will not allow the defendant to plead it to the disadvantage of the plaintiff." And the defense was approved, and the release declared properly found void by the jury, the court saying, after a full discussion of the precise point: " Granting there was no positive fraud on the part of the defendant or its agents, there was evidence to prove . . .. that the plaintiff executed the release by mistake, occasioned by his ignorance, physical pain, mental anxiety and lack of capacity, under the circumstances, to understand and comprehend the nature of such release. . . . . Mere ignorance, mere inadequacy of consideration, mere weakness of mind, mere mistake on the part of one party, will not entitle that party to release. ' But it is otherwise where there is a combination of such things to prejudice the party. In such case, in good faith and fair dealing, the adverse party ought to see and know, and must be presumed to know, that the complaining party was not fit or in such mental condition as to bind himself by contract.

The point in this case which has troubled us, and which we

have considered again and again, is as to whether appellant ratified the release. The strongest testimony in the record against appellant is his own. He says he spent all the money, from time to time, his wife having put it away; that, after his head got clear, he was told by his wife what settlement had been made; but he does not know how many days after the transaction it was before his head got clear, but that he did use all the money. The whole testimony of appellant and his wife on this subject presents this as the state of case: Appellant was in bed two months, after that sitting about the house; he was stupid, and took medicines to "ease him," gotten from Dr. Hughes, for about two weeks after the settlement. Mr. and Mrs. Crisler saw him apparently about that time, though there is no positive statement as to the exact date of their visit. He was unwilling to "fool with" just anybody; he wanted to see somebody with whom he was acquainted. He used to belong to Mr. and Mrs. Crisler. Mrs. Crisler told him she would have Colonel Thomas employ a lawyer. In about three weeks after the injury, Mr. Williamson was interviewed by his wife, and "that day, or the next," Colonel Thomas saw Mr. Williamson in appellant's interest. His wife came again, and Williamson & Potter were employed. His wife first told him of the settlement about two weeks after the settlement, and he immediately said "if he had been in his right mind" he would not have made it. He denies most positively ever telling anybody he was satisfied. It thus appears, if this testimony be true, that he knew nothing of the settlement for about two weeks; that he took steps, as soon as he saw some white friends he could trust—his old master and mistress—to employ counsel in about two weeks, and in about three weeks, through his wife, had done so, he being confined to his bed some five weeks thereafter. The whole amount paid by the appellee has been tendered by him. There has been no change of appellee's status to its disadvantage. Both parties can be put just where they were. After the most careful consideration, and repeated ex-

amination of the record and the authorities, we are clear that, whether there was a ratification should have been left, on all the testimony, to the jury.  10 Am. & Eng. R. R. Cas., 716; 11 *Ib.*, 128; 26 *Ib.*, 203.

If the release was void, no tender was necessary.  109 Ill., 120; 127 Mass., 86; 18 Kan., 58.  But all that is necessary is that the jury, in case a verdict should be found for plaintiff, should credit any amount they may find with the money paid plaintiff by defendant, and legal interest thereon, as clearly held in Llewellin's case, 1 Cox's Cases, 333; *Doyle* v. *Railroad*, 18 Kan., 58.  The principle announced in these cases is eminently just, and meets our approval.  Once more we take care to say we are, in the above statement as to the ratification, stating only the testimony of appellant and his wife.  A wholly different version, as to both release and ratification, is given by appellee's witnesses.  But the court, by the peremptory charge, took both these questions of fact from the jury.

The injury is this case was inflicted by what is known in railroad terminology as a "kicked" car.  It is earnestly insisted that § 3548, code 1892, is violative of charter rights, and in excess of police power; that it practically denies to the appellee the use of its tracks and cars, and is, hence, an unwarranted exercise of legislative power.  This section of the code is a legitimate and wholesome exercise of the police power of the state.  It does not deny to railroads the right to the use of their tracks, but regulates that use in a way demanded by the "comfort, safety, and welfare of society."  Cooley's Con. Limitations, 5th ed., p. 712.

We make no doubt that, when a few years of experience shall have shown their diminished record of injuries, due to the high degree of care which the statute exacts in the circumstances to which it applies, and, as a corollary, the better feeling on the part of the community towards the railroads traversing their territory, the railroads themselves would be the last to seek a repeal of the law.

Appellee seems to see only chastisement in this statute.    Even so viewed, there is comfort in the reflection that, whilst "no chastening for the present seemeth to be joyous, but grievous, nevertheless, afterward it yieldeth the peaceable fruit of righteousness unto them that are exercised thereby." For a collection of similar statutes, see Stinson's Am. Stat. Law, vol. 2, § 8811 *et seq.;* Tiedeman on Police Powers, § 194.

It is said by counsel for appellant that the court below stated that he granted the peremptory instruction, believing at the same time it was not proper, but feeling himself bound by *Railway Co.* v. *Turnbull,* 71 Miss., 1029.    That case is readily distinguishable.

The only error we find in the action of the learned judge is in failing to follow fearlessly the promptings of that invariably fine sense of right which has enabled him, through so many years and with· such marked ability, "to execute justice and maintain the truth."

For the error in granting the peremptory instruction, the
                    *Judgment is reversed and cause remanded.*