BRIDGET McGRAIL

*v.*

THE JERSEY CENTRAL TRACTION COMPANY.

[Decided May 12th, 1915.]

1. Evidence on a bill to set aside complainant's release and to enjoin its being set up as a defence to her suit against a carrier for personal injuries, on the ground that she was unaware of its contents until it was pleaded, and that when she signed it it had been explained to her as a payment to her sister for time she would be compelled to leave her work and attend to complainant—*Held*, to show that the release was read and explained to complainant and her sister, and that they were told that it would prevent the recovery of any further sum on account of the injury.

2. Where complainant, a woman of thirty-five, injured by the starting of defendant's trolley car, resulting in bruises and severe nervous shock, which prevented her from attending to her regular work when weakened by the injury, and without advice or understanding of her rights on a single interview by defendant's superintendent and claim agent, signed a release in full, in consideration of $35 covering compensation only for her lost time and that of her sister who was attending her, and not for the injury itself, though it was mentioned in the release, induced by the claim agent's statement of the physician's opinion that the injury was slight, there was such undue haste and pressure that it would be set aside as being an unfair and inequitable advantage against complainant.

Heard on bill, answer, replication and proofs.

*Mr. Michael J. Tansey,* for the complainant.

*Mr. Warren H. Smock* and *Mr. Henry D. Brinley,* for the defendant.

*Messrs. Wilson & Smock,* solicitors.

EMERY, V. C.

On Sunday, May 24th, 1908, the complainant was injured by the starting of a trolley car operated by the defendant while she was boarding the car. Five days later she executed a release by which the receipt of $35 and the payment of the physician's bill rendered, and to be rendered, was declared to be in full settlement for all claims and demands in any way connected with this accident, from which, as stated in the receipt, bruises and nervous shock resulted, and the company was released from any further liability as a result of the accident. After a return of the $35 which the company refused to retain, and in January, 1909, complainant brought suit against the company to recover $5,000 damages for the accident, and in this suit the company pleaded the release in bar of the action, setting out the same in full by its plea. This bill was filed in December, 1911, to set aside the release and enjoin its being set up as a defence to the suit. By its terms, it covers the claim sued on. It was signed by the complainant making her mark thereto, and, as ground for setting aside the release, the bill alleges (1) that until it was set out in the plea, complainant was wholly unaware of its contents, that at the time it was signed by her mark it had been explained to her as being for the payment of $35 to her sister, with whom she lived, for the time the sister would be compelled to leave her work and attend to her, and to pay in addition the doctor's bill for herself. As a further ground she alleges (2) that she was induced to sign this release by representations then made to her by two officers or representatives of the company who procured it, as to the statements and opinion of Dr. Hoagland, the physician of the company, who had been called in as to her condition and the nature of her injuries, which statements were found to be false after she had signed the release. These

statements were that they had seen Dr. Hoagland who said she would be well and able to work in ten days; that the nervousness had come on her suddenly and would be apt to leave her just as suddenly; that he had been to see her twice, and after his third visit on that day expected to have to come three days more. And, as another ground for setting aside the release, the complainant alleges (3) that at the time of its execution, she was seriously ill, both in body and mind, unable to sign her name or even to make the signature by mark; that she was unable to comprehend the effect of this document signed by her; and that being in this condition the company's representatives urged and procured its execution before she could obtain proper counsel and advice.

Complainant's injuries resulting from the accident are alleged to have been very serious and such as to confine her to the bed and house for more than two years, and permanently incapacitate her for work, and make her dependent on her relatives for support; and further, that she still continues to require constant medical attention, the charges therefor up to the time of filing the bill being over $500, which she is without means to pay. The defendant's answer admits the accident, but denies the severity of the injuries, and denies that its agents, at the time of the release, represented that they had seen Dr. Hoagland, who said she would be well and able to work, or that he expected to come three days more, but admit that Dr. Hoagland said this nervousness had come upon her suddenly and would be apt to leave her just as suddenly. The answer denies the allegations of the bill, as to the complainant's mental and physical condition at the time of the execution of the release. As to statements made by its agents in reference to Dr. Hoagland at and about the time of the release, the answer undertakes to set out specially what did occur and substantially as follows:

"On Thursday, the day of the first call of Dimick and Brinley upon the complainant, she declined to talk to them about the accident or a settlement, in the absence of her sister, and they then told her Dr. Hoagland would be there that night to see her, and she would be in a better position to talk settlement because of this; that on the next day (Friday) when Dimick and Brinley called, Dimick stated that he had seen Dr. Hoagland that day (Thursday) and that the Doctor had said

to him that as far as he could see at that time, complainant was suffering from no serious injury and no vital organs had been affected; that in his opinion complainant had received a severe nervous shock; that he could not tell how long complainant would be ill, but that he saw no reason why her recovery should not be rapid and that the nervous shock was likely to leave her as quickly as it had come."

The answer then states:

"That negotiations were then entered into for settlement, in which the complainant's earning capacity was discussed, the number of days she had been and probably would be ill, the amount of the physician's bill, the likelihood of suffering or pain extending into the future were discussed, and after conversation of half hour or more, an agreement to adjust the matter on the payment of $35 cash and the physician's bill was reached, and the release was then prepared by Mr. Brinley, read aloud by him, then handed to complainant's sister, who was present, examined by her and pronounced all right, and was then offered to complainant, who was lying on a couch, to read."

The answer further says that before it was presented to the complainant to sign, Mr. Brinley explained to her that the writing was a release, which freed the company from any liability thereafter except the payment of the doctor's bill; that complainant could never get any more money from the company on account of her injuries, and stated further that the length of her illness necessarily was unknown, that she might get up in a day or two, and in that event complainant would have the better of the bargain, or that she might be ill longer than was estimated, and in that event the company would have the better of the bargain, but, in any event, no matter whether complainant was sick a day, a month or a year, the doctor's bill would be paid. As to signing the release by mark complainant alleged her arm was too sore for her to write, and that Mr. Brinley, thinking she did not know how to write, consented to the making of her mark, which she did by taking hold of the end of the pen, held by Mr. Brinley. The answer further discloses that a bill of $64 for Dr. Hoagland's services has been paid, and that Dr. Cooley, who was subsequently employed, has presented a bill for $500.

The first claim of the bill, that the complainant was not aware of the contents of the release and that it was explained to complainant and her sister as given for the payment of $35 only

for the lost time of her sister in attending her, has not been made out. This statement is made by both sisters in their evidence, but is denied, circumstantially, and in detail by both Dimick and Brinley, and I credit the evidence for the defendant on this point rather than that for the complainant.

I am satisfied, on the proofs, that the release was in fact read and explained, and that both complainant and her sister were informed as to its contents, and were also told by Mr. Brinley that the effect of it would be to prevent the recovery of any further sum from the company on account of this accident. The question is whether either of the other claims in the bill, attacking the release by reason of its having been procured by misrepresentation of Dr. Hoagland's opinion as to complainant's injuries, or by haste and pressure for settlement at once, and without further advice, in complainant's weakened physical condition, is well founded.

As to the character and extent of the injury, the evidence establishes that the severe nervous shock which at the time of the settlement was admitted on all hands to have occurred, has turned out to be much more serious and permanent in its results than any of the parties negotiating about the settlement apparently contemplated at the time. According to the account of all the witnesses, the release was based on the anticipation that the physician who had made three or four visits would only be required to make about the same number and that complainant would be able to return to her usual work in a few days. But Dr. Hoagland continued his visits until about June 1st, and then another physician, Dr. Cooley, was called in, by consent of the defendant, and has since attended her. Dr. Hoagland died before the hearing of the cause. Dr. Cooley's opinion is that there was concussion of the spine at the time of the injury, the serious effects of which subsequently developed. On all the evidence, I think it appears clearly and satisfactorily, that at the time of the settlement, compensation to the complainant herself as for any serious permanent personal injury was not expressly spoken of by either party and suggested as to be paid for, and that the payment of the physicians' expenses for necessary attention in the future, and the allowance for a short loss of time, was the only

provision intended to be made for the complainant's compensation for the injury.

The terms of settlement and release were agreed on in the presence of four persons, two of them representatives of the company upon one side, Mr. Dimick, its superintendent at the time, and Mr. Brinley, an attorney, its claim agent, and complainant, and her sister Mary McGrail, on the other. These women, aged, respectively, about thirty-five and thirty-eight years, lived together in very moderate circumstances and supported themselves in their home, mainly by light farm work, bunching asparagus, gathering berries, &c., in the summer, and needlework in the winter. Their ordinary wage at farm work was not over two dollars a day each. They were not familiar with business or with legal documents of this kind, or with their execution, and had and asked no aid or advice of counsel or others in the settlement of the claim, which was effected at a single interview, lasting probably less than an hour. The disparity between the parties, and the circumstances attending the settlement, were such as to require the release to be scrutinized with extreme care, under the rule laid down by the court of errors and appeals in *Dundee Chemical Works* v. *Connor* (*Court of Errors and Appeals, 1890*), *46 N. J. Eq. 576*. It was further said by Mr. Justice Magie in that case (at *p. 582*) :

"It is only when the contract is got from the illiterate, the weak-minded or distressed party, under circumstances which indicate that it was procured by artifice or deception, or by undue pressure and importunity inducing action without advice or time for deliberation, or by advantage taken of distress, or for no or an inadequate consideration, or is otherwise inequitable, that it will come under condemnation."

This statement expresses the further rule to be applied in this case.

[Here follows a statement and discussion of the evidence.]

Upon consideration of the evidence, I conclude that there was a settlement of an undisputed claim for damages for an injury occurring five days before, resulting in bruises and severe nervous shock, which disabled complainant from performing her usual work necessary for her support; that this settlement, and

the agreement upon the small sum ($35) actually paid to complainant by way of personal compensation for the injury, was based upon negotiations directed by the company's agents and which covered a compensation only for complainant's lost time and that of her sister's in attending her, about eight or ten days in all; that the payment of personal compensation to complainant for any injury from the severe nervous shock itself, beyond the loss of time for her work, ten days only, was not taken into account or considered by the complainant as a subject for compensation, although it was specially in the minds of the agents of the company, and was specially mentioned in the release; that the agents of the company (or one of them), by statements of the complainant's physician's opinion as being given to him, relating to the temporary character of the injury from nervous shock, and of his (the agent's) opinion thereon, procured this omission in the negotiations of any special consideration of the effects of this nervous shock beyond ten days' loss of work, in fixing the consideration for the settlement; that the complainant was at the time in such a weakened condition from the injury that she was not able to protect herself in the terms of a settlement that involved this injury from nervous shock, without assistance and advice, and that neither she nor her sister, who was her only adviser, was either able or competent to realize the position or rights of complainant in reference to an immediate settlement of complainant's claim for all injury from the nervous shock, on the faith of these representations as to the physician's opinion, and a release based on them, without at least giving complainant opportunity to consult the physician; that undue haste and pressure were used in obtaining the immediate execution of this release, based on the agent's statements of the physician's opinion; and I further conclude that, upon the whole evidence relating to the negotiations for settlement and the execution of the release, it appears that such an unfair and inequitable advantage was taken by the company's agents, that the release must be set aside.

I will advise a decree setting aside the release and an injunction against proving it in the suit at law.

Upon settling decree, I will hear counsel upon the question whether conditions shall be imposed either as to the return of the money paid or of physicians' fees paid.