### No. 20,176.

MRS. WILLIAM B. ORR, *Appellee*, v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant*.

#### SYLLABUS BY THE COURT.

1. NEGLIGENCE — *Personal Injuries — Verdict — Special Findings.* The evidence examined and found to support the general verdict. The special findings examined and held not essentially inconsistent with one another or with the general verdict.

2. SAME. The rule that the general findings must, if possible, be harmonized with the general verdict, followed.

3. RAILROAD ACCIDENT—*Personal Injuries—Procuring Releases Therefor.* The practice of procuring or attempting to procure for a nominal sum a release from one still suffering from the excitement and pain of a recent injury is not to be encouraged or judicially approved.

Appeal from Wyandotte district court, division No. 3, HUGH J. SMITH, judge. Opinion filed May 6, 1916. Affirmed.

*W. P. Waggener, A. E. Crane*, both of Atchison, and *Justin N. Baird*, of Kansas City, for the appellant.

*W. W. McCanles, H. F. Gorsuch*, both of Kansas City, and *S. N. Hawkes*, of Topeka, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff, who was in her sixtieth year at the time of the trial, was on December 22, 1914, a passenger on one of the defendant's trains which was derailed and wrecked near Martha about two o'clock in the morning. The plaintiff having received certain injuries was taken to the baggage car, where she remained until about three o'clock in the afternoon, when she was removed to the defendant's hospital at Hoising-

Orr v. Railway Co.

ton.  The next morning at about ten o'clock a claim agent paid her $25 and procured from her a release.  During that day she wrote a letter to a friend at Durango, Colo., and also signed a telegram sent for her by the claim agent to her brother at Claremore, Okla.  On the 24th she rode in an ambulance to the train, which she boarded for her brother's home in Oklahoma, changing at Osawatomie, to which place she was accompanied by a nurse.  She afterwards brought this action and recovered a judgment for $2700, from which the defendant appeals.

The assignment of error and the argument thereon raise three questions: The sufficiency of the evidence to sustain the verdict, the failure of the court to direct a verdict and give certain other requested instructions, and the refusal to enter judgment for the defendant on the special findings and to grant a new trial.

A thorough examination of the record leaves no question as to the sufficiency of the evidence to support the verdict aside from the question of release, which will be noticed later.  And while, as is frequently the case, there was conflicting evidence from which different conclusions might be drawn, and while the weight and credibility of certain testimony might be viewed differently by different persons, nevertheless the general verdict finds support both sufficient and ample.

What has already been said is conclusive on the question of failure to direct a verdict for the defendant.  The instructions have been carefully considered, and are found to have been proper and beyond question fair to the defendant.

The defendant moved for judgment on the findings, and also for a new trial.

The following were the special questions and answers :·

"1. Q. Was the plaintiff of sound mind at the time she brought this action?  A. Yes.

"2. Q. Was the plaintiff conscious at any time on the 23rd day of December, 1914?  A. Part of the time.

"3. Q. What injuries did the plaintiff complain of while at the hospital at Hoisington on December 22nd to 24th, 1914?  A. Ankle, knee and back.

"4. Q. When plaintiff wrote the letter to Mrs. Alice B. Hannon on December 23rd, 1914, did she know what she was doing?  A. Part of the time.

"5. Q. At the time plaintiff received the $25.00 from the defendant did she know just how much she was getting, and that it was being paid to her by defendant?  A. Yes.

"6. Q. Did the plaintiff on December 23rd, 1914, authorize a telegram to be sent to her brother in Oklahoma, stating she was delayed by reason of a storm?  A. Yes.

"7. Q. At the time the telegram was sent, did she know what she was doing?  A. Yes.

"8. Q. Did the plaintiff sign the draft and release introduced in evidence herein, and if so, did she receive the $25.00 as therein stated?  A. Yes."

It is repeatedly and vehemently said that the plaintiff was conscious all of the time on the 23d day of December, and that the answer to question No. 2, that she was conscious part of the time, was made in order to be in harmony with the general verdict. The evidence of the plaintiff, however, which the jury appears to have believed, contained repeated statements indicating the truthfulness of their answer.

"I know they were very good to me after I was in bed. It is rather misty, but I knew it was a place for me to stay. I remember the caps on the nurses' heads. I thought the track had to be made over before we could start again. The button in the hospital puzzled me some and the nurse told me if I needed anything, to push on the button, but I was afraid of it for some time. I did not know what might happen. My head got better and I rang the bell two or three times. They were prompt in looking after things for me. I do not know how long I was there."

In speaking of the transaction with the claim agent, she said:

"I do not remember much about it, I remember his asking me if I could change a ten, when he said he would give me $25.00, and I had that five in my hand bag. I thought they were letting me have the money to go home on. . . . I do not remember signing a statement there that morning. That is my signature to that paper. I do not remember signing it, nor the questions. . . . Yes, he told me to sign the papers. Of course I had been hurt, but I did not know why it was. I thought they just wanted to say who was hurt on the train."

In a letter written on the same day to her friend at Durango was the following statement:

"Am yet puzzling my brain to solve the problem how any engine, mail, two baggages and three passenger cars could have raised every tie, and sill, and run a bare dirt road over a hundred yards on a curve before making the tumble, and that with no more than slight cuts and bruises to but two passengers (myself and a little girl) when two of the last named were simply packed. That I am rather the worse for the

experience is due to the coach taking the tumble and then going a bit farther, trying to stand on the front end. As I was on the second seat, I took the place of 'bottom rail'." .

As there is no evidence that the wrecked train tore up the track or ran on any bare dirt road at all, it being stated in the argument that such was not the case, the quoted language does not indicate mental equilibrium or lucidity on the part of the writer. Hence, when the jury said she knew what she was doing part of the time when she wrote the letter, they had some justification for their answer. That she knew how much she was getting, and that it was being paid to her by the agent when she received the $25, is not necessarily controlling, but as the jury found she signed the draft and release, and received the $25 "as therein stated," this is deemed by the defendant to be proof conclusive that she is bound and barred thereby. The draft recited merely an order to pay the plaintiff $25 and charge it to the account of an accident December 22, 1914, while a passenger on train No. 2, which was derailed near Martha, Kan. The release recited that the $25 was received in full payment of all claims and demands arising from or growing out of any and all personal injuries then apparent, as well as those that might thereafter develop, as the result of an accident December 22, 1914, while a passenger on train No. 2, which was derailed near Martha, Kan., and as a release and discharge from all suits, cases, causes of actions, claims and demands of every class and character in any wise connected with such accident. It would hardly be fair to hold, because the jury found the plaintiff received the $25 "as therein stated," that she received such sum understandingly as a satisfaction, settlement and release of all present and future claims arising out of the derailment which caused her injuries. To give this extreme meaning to the finding would be to violate the rule which requires that it be harmonized if possible with the other findings and with the general verdict. (*Kansas City v. Slangstrom,* 53 Kan. 431, 36 Pac. 706; *Railway Co. v. Bussey,* 66 Kan. 735, 742, 71 Pac. 261; *Osburn v. Railway Co.,* 75 Kan. 746, 90 Pac. 289; *Ahlstrom v. Kansas Milling Co.,* 85 Kan. 548, 550, 118 Pac. 57.)

Aside from the allegation that the company and its agents who procured or attempted to procure the release, knew or should have known that the plaintiff was not rational, and

was incompetent to make a contract or execute a release, there was no averment of fraud. It is a pleasure to state that the young man who procured the instrument is not charged with intentional bad faith or overreaching, but appears to have conducted himself in a courteous manner. The practice, however, of procuring or attempting to procure such instruments from those still suffering from the excitement and pain of a recent injury, is one which must inevitably carry with it strong suspicion of undue haste and of unfairness, and such practice has not been, and should not be, encouraged or judicially approved. (*Railway Co. v. Cunningham,* 59 Kan. 722, 54 Pac. 1055; *Railway Co. v. Goodholm,* 61 Kan. 758, 60 Pac. 1066; *Railway Co. v. Peck,* 79 Kan. 413, 100 Pac. 54; *Remy v. Packing Co.,* 90 Kan. 224, 133 Pac. 707; *Union Pacific Railway v. Harris,* 158 U. S. 326.)

In the Cunningham case it was said:

"Where such unseemly haste is made in obtaining settlements with parties who have sustained such serious injuries, and where the amount paid is so trifling and utterly disproportionate to any just compensation, it seems like wasting time to nicely discuss questions of evidence bearing on the plaintiff's capacity to transact business." (p. 727.)

Here a woman near sixty years of age established such injuries that she has received at the hands of the jury a verdict for $2700, although opposed by counsel of marked ability and proverbial influence with juries. This verdict has met the approval of the trial court. And yet, because of the document signed while in the hospital at Hoisington the day after the wreck, we are exhorted to hold that her recovery must go for naught. While such instruments, like other contracts, when freely and understandingly entered into are binding, however inequitable or one-sided, still when the question of contractual competency is raised and the evidence is such as to warrant fair-minded men in coming to different conclusions, the one reached by the jury is not to be set aside.

From all the circumstances shown by the record, the jury were justified in their general conclusion, and their answers to the special questions were sufficiently in harmony therewith to preclude a judgment on such findings for the defendant, and to render the action of the court in refusing a new trial proper.

The judgment is therefore affirmed.