RAY BLINDER ET AL. *v.* FLORENCE D. MONAGHAN
[No. 23, October Term, 1936.]

78

*Decided November 17th, 1936.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Calvin Carney,* for the appellants.

*Edward L. Putzel,* with whom was *Julius H. Wyman,* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Mrs. Florence K. Monaghan was injured as the result of a collision between a taxicab, in which she was a passenger, and a small truck, which occurred at the intersection of Charles and Thirty-Second Streets in the City of Baltimore at about noon on June 1st, 1935. The taxicab was owned by Ray Blinder, trading as the Diamond Cab Company, and operated by Frank C. Rose; the truck was owned and operated by Isidor Caplan. On August 28th, 1935, Mrs. Monaghan brought this action in the Superior Court of Baltimore City against Blinder, Rose and Caplan, on the theory that the collision and her injuries in consequence thereof were caused by the negligence of those defendants.

As a result of the pleadings, these issues of fact were ultimately tendered: (1) Was the collision caused by the negligence of the defendants or either of them? and (2) Did the plaintiff execute a valid release to Blinder exonerating and releasing all the defendants from any liability for the injuries which she suffered as a result of the collision? The case was tried on those issues before the court and a jury, and at the conclusion of the trial the jury returned a verdict in favor of the plaintiff against Blinder and Rose, and in favor of the defendant Caplan.

This appeal was taken by Blinder and Rose from that judgment.

At the close of the whole case Blinder and Rose submitted two prayers marked A and B, which were general demurrers to the evidence, one prayer, C. that there was no evidence in the case legally sufficient to show that the release had been obtained by fraud, one, D, that it had been obtained "by the mutual mistake of the parties," one, E, that it had been obtained by duress, one, F, that it was obtained when the plaintiff was incapable on account of her mental condition of executing a valid deed or contract, one, G, that it was without consideration, and one, H, combining the propositions embodied in prayers C, D, E, F, G, and H. Of those prayers A, B, F, and H were refused and the others granted. By their "2 Prayer" the court was asked to instruct the jury that the burden was on the plaintiff to prove by "clear, precise and indubitable evidence" that the release was executed at a time when she was mentally incapable of executing a valid deed or contract; their "10 Prayer" involved the same proposition, while in their "12 Prayer" they asked the court to instruct the jury that to set aside the release they "must be convinced by clear, direct and satisfactory evidence" that the plaintiff at the time she executed the release "was incapable of executing a valid deed or contract." These prayers were refused. The rulings on the Caplan prayers were not argued by the appellants and need not therefore be considered here. Rule 39, sec. 4, Court of Appeals.

In the course of the trial, the plaintiff's family physician was permitted, over appellants' objection, to express an opinion as to her mental capacity at the time she executed the release. Their contention is that in so ruling the court committed reversible error.

The appeal therefore presents three questions: (1) Was there in the case evidence legally sufficient to support the inference that the accident complained of was caused by the negligence of the appellants? (2) Did the trial court commit reversible error in permitting Dr. Cassidy

to express an opinion as to the mental capacity of the appellee at the time she executed the release to Blinder? and (3) was there in the case evidence legally sufficient to permit a rational inference that the release was invalid?

The first question involves a review of the evidence relating to the circumstances attending the accident, which for convenience will be stated as a narrative.

There was evidence tending to prove these facts: The appellee, accompanied by her brother-in-law Henry Patterson, entered Blinder's taxicab, driven by his employee Frank C. Rose, on Thirty-Second Street, a half or three-quarters of a block east of Charles Street. The cab then proceeded west on Thirty-Second Street to Charles Street, which at that point is a "stop" or "boulevard" street. As the cab came to Charles Street a "Blue Line" bus of the Baltimore Transit Company, going north, was coming to a stop on the east side of Charles Street at its intersection with Thirty-Second Street, to discharge passengers. At the same time a truck owned and driven by Caplan was also going north on Charles Street behind and to the left of the bus, and as the bus slowed down he continued on at the rate of about twenty miles an hour, intending to pass. In the meantime the cab, proceeding west on Thirty-Second Street, reached Charles Street. The bus had then stopped. The taxicab driver either slowed up or stopped, and then proceeded in front of the standing bus into Charles Street. Before he entered Charles Street he had seen Caplan's truck between Thirtieth and Thirty-First Streets, but lost sight of it when the bus intervened. The testimony as to the speed of the truck varies. Caplan said he was driving at about twenty miles an hour, Rose, the cab driver, said he was going as fast as thirty-five miles an hour, other witnesses said that it was going at a "fair" rate of speed, and at an excessive rate of speed.

When the bus stopped, Rose said: "Before I got there I noticed a machine—that is, truck, back about between Thirtieth and Thirty-First Streets. When the bus had

stopped, I figured I had time enough to get across, which I just nosed my front of the car out about two feet out on Charles Street, when this bus coming, I suppose about thirty or thirty-five miles an hour—" Question by the Court: "Q. You mean the truck or the bus? A. I mean the truck, rather, coming about thirty-five miles an hour, swerved around the bus and hit me on the right side— right front and he "drug" himself—that is when he swerved around the bus, he seen me and he threw on the brakes and he probably skidded about eleven or twelve feet, and his rear fender crashed into my right front side." Later he said on cross-examination: "I was waiting for the truck to come by so I could shoot on by, but instead of him coming straight up he came around the bus and hit my right front with his right rear fender; I was standing still at the time; I had not moved; I had just pulled up and stopped waiting for him to go by about a second or two, and he came around the bus."

John M. Curry, the driver of a southbound bus, who saw the collision, said: "The truck came alongside the bus * * * It got past the front of the bus, and the taxicab had in the meantime—must have pulled out into the street and they collided." He further said that the two vehicles stopped at the point of collision, that they were "locked together * * * the right front of one against the left front of the other."

Raymond Ossimus, driver of the northbound bus, said that the cab stopped at Charles Street, started again "west, turning south on Charles Street" and "then the truck came up and they both collided," and when asked what part of the cars came together, answered: "The left front of the cab—probably both hit together like that, (indicating) at a point."

Warren L. Baker, another witness, also said that the truck hit the right front axle of the taxicab. Caplan testified that he did not vary his course as he passed the bus, that he kept straight ahead, that the taxicab crashed into him, that its left front fender struck the right rear

of his truck, that after the impact he skidded "two or three feet."

Those facts, which are conceded by the demurrer prayers, are sufficient to support the inference that Rose drove the taxicab in front of the bus, which obstructed his view of traffic approaching from the south, directly in the path of through northbound traffic on Charles Street, when he had actual knowledge that the truck was approaching the intersection, and that Charles Street was a "stop street," on which all through traffic in either direction had the right of way. Code, art. 56, sec. 209, as amended by Acts 1929, ch. 224.

Neither argument nor authority are needed to characterize such conduct as negligent. The appellant suggests that Caplan was proceeding at an unlawful rate of speed, but there are three answers to that, one that there is affirmative testimony that he was proceeding at a lawful speed, the other that, if he had been going more slowly, instead of striking the front of the taxicab he may have struck it in the center or rear, the third that Rose had no right to interfere with the traffic on that street, whether it was fast or slow. In view of the statute, it was incumbent upon the taxicab driver, before he entered Charles Street, to make sure that he would not interfere with either north or south bound traffic thereon, and if for any reason his view of the thoroughfare was so obstructed that he could not observe the traffic on it, it was his duty to wait until the obstruction cleared, or to take adequate measures to discover whether the way was clear. The manifest purpose of the statute is to facilitate and expedite the movement of traffic within and between congested centers of population by setting aside selected highways as through roads, over which traffic may move without interruption or delay. To accomplish that, it dispenses with the right of way rules applicable to highways generally, and gives the right of way to all traffic on such highways, and, as a necessary police measure for the protection of the traveling public, it provides that no one shall enter such a highway without first stopping, and

that, having stopped, the operator of any vehicle approaching such a highway shall yield the right of way to "all vehicles approaching" thereon. Where, as in this case, the operator of a vehicle enters such a highway in disregard of these explicit and mandatory rules, and collides with another vehicle approaching thereon, the collision can only be attributed to his negligence, for in such a case the principle announced in *Sun Cab Co. v. Faulkner,* 163 Md. 477, 163 A. 194, applies with peculiar force. There a taxicab, proceeding at an excessive speed, collided with a second taxicab which entered the intersection against a red or stop light, and it was held that the fact that the first cab was driven at an excessive speed did not render the owner liable, because it appeared that the proximate cause of the accident was the act of the driver of the second taxicab in disregarding the stop signal. The appellants' A and B prayers were therefore properly refused.

The second question is whether there was reversible error in permitting Dr. Henry F. Cassidy to express an opinion as to the mental condition of Mrs. Monaghan at the time she signed the release. That ruling, which is the subject of the first exception, relates to this testimony: "Doctor, at the time you examined her, was she in your opinion capable of executing a valid deed or contract? A. I should say no, on account of the amount of suffering."

Doctor Cassidy had been the family physician of the plaintiff for fifteen years. He examined her "towards dusk" on the day of the accident. He found her "shocked, rather dazed, suffering," that she complained "bitterly of her face, neck and shoulder," that she was bruised generally throughout the body, and that there was apparently a displacement of the fifth "cervicle vertebrae." After he had given that testimony, he was asked and permitted to give this testimony: * * * "Q. Was she in any condition then to execute a valid deed or contract? A. I don't think so." There was an objection by counsel for Caplan, but no ruling on it nor any exception noted, nor did appellants' counsel even object to it. In view of that testi-

mony, which preceded that involved in the exception, it is not apparent how the appellants were injured by the ruling complained of in the first exception. It is a legal commonplace that if testimony, even though inadmissible, is offered without objection, the admission of the same or similar testimony later over objection will not constitute reversible error. *Dennis v. Hearn,* 148 Md. 391, 394, 129 A. 354; *Mercantile Savings Bank v. Appler,* 151 Md. 571, 578, 135 A. 373; *Parks v. Griffith & Boyd Co.,* 123 Md. 233, 244, 91 A. 581; *Barnes v. United Rwys & Elec. Co.,* 140 Md. 14, 16, 116 A. 855. In support of their contention the appellants also rely upon a motion to strike out the first answer of the witness. The court overruled that motion, which is the subject of the second exception. It appears, however, that that motion was not made by the appellants, but by Mr. Harrison, the attorney for Caplan. The interests of the appellants and Caplan were not the same, but hostile. The appellants contend that the "proximate and sole" cause of the accident was Caplan's negligence. Appellants' brief, page 34. Caplan contended that it was caused by failure of the driver of the taxicab to yield the right of way. Caplan's "1 Instruction." Under such circumstances it is settled that the appellants cannot have the benefit of Caplan's exception, *Sline & Sons v. Hooper,* 164 Md. 254, 164 A. 548.

Moreover, the motion was too late and also too general to present any question of law. It was in this form: "As to the Doctor's testimony I want to make a motion to strike out the answers of opinion." His statements that the appellee was shocked, dazed, in pain, that there was a dislocation of the cervicle vertebrae, that her responses to questions were rational, that she was suffering and in constant pain, all to some extent embodied opinions, but were not only unobjectionable, but no objection was made to them. Since the motion went to all the opinions, some of which were unobjectionable, without indicating the particular opinion or opinions at which it was aimed, it was for that reason, also, properly overruled. *Jones on Evidence,* sec. 895; *Wilson, Close & Co. v. Pritchett,* 99

Md. 583, 58 A. 360; *United Rwys. & Elec. Co. v. Wehr & Co.,* 103 Md. 323, 63 A. 475; *Balto. & O. R. v. Whitehill,* 104 Md. 295, 64 A. 1033.

The only difference between the answer given without objection and the answer allowed over objection is that in the former the witness said he did not "think" she was in "any condition" to execute a valid deed or contract, while in the latter he said "I should say no, on account of the suffering." There is no essential difference between the two answers; they were alike expressions of opinion, and the same opinion. The inquiry implicit in both had nothing to do with mental disease, but they related solely to whether the physical injuries the appellee had sustained had so suspended or deranged her mental faculties as to render her incompetent to perform an ordinary business transaction.

In such a case the opinion even of an expert is entitled to little weight, for, as stated by Judge Digges in *Johnston v. Schmidt,* 158 Md. 555, 568, 149 A. 283, 288: "On the other hand, when the question is not one of sanity or insanity, but is one of incapacity shown to be due to the temporary dethronement of the mental faculties by the administration of opiates, the obscuration resulting from the near approach of death, or the like, witnesses can, without difficulty and without consuming much time, state in detail the facts as they existed, which, when stated, place the jury in equally as advantageous position to determine the capacity of the testator as the witness could possibly be, and therefore the opinion of the witness amounts to no more than saying that if he were on the jury he would find that the testator had capacity or lacked capacity, as the case might be. Given the same facts, it is the jury's province, and not the witness', to reach a conclusion as to mental capacity." In that case the court was considering the opinion of a lay witness and it was held the opinion of such a witness is inadmissible to prove the effect of opiates, or the near approach of death "or the like," on the mental faculties. But while the reasoning of that conclusion would seem in many cases to be

as applicable to expert as to lay witnesses, it is generally held that an expert may be permitted to express an opinion as to the effects of drugs or intoxication (*Lyon v. Townsend,* 124 Md. 163, 186, 91 A. 704; 22 *C. J.* 668) or approaching dissolution, or other like causes (*Johnston v. Schmidt, supra*) upon the human mind. On the other hand, it is well settled that the expert cannot invade the field of common knowledge, and if the inquiry is as to a matter within the knowledge and experience of all persons of ordinary judgment and experience, there is no reason for the admission of opinion evidence, expert or otherwise (11 *R. C. L.* 591), for "if the subject is one of common knowledge, as to which the facts can be intelligently described to the jury and understood by them, and they can form a reasonable opinion for themselves, the opinion of an expert will be rejected" (*Id.*) as to conclusions to be drawn from known stated or observed facts within that field. In this case the witness' conclusion was based in part upon the facts that Mrs. Monaghan was dazed, shocked, and suffering great pain. Unfortunately, pain and suffering and shock, and their effects, are too common to need expert interpretation, and as those facts were the only basis of his conclusion, it should have been excluded. But for the reasons stated, we do not regard the error as reversible.

Since no point was made in this court upon the court's rulings in respect to the jury prayers, the only remaining question is whether the release from Mrs. Monaghan to Blinder is valid.

There is in the record evidence tending to prove the following facts and circumstances attending the negotiation and execution of that instrument:

The accident occurred at about noon at Charles and Thirty-Second Streets, a short distance from the Union Memorial Hospital. Mrs. Monaghan was at once taken to the hospital, and at 12.10 p. m. was examined by Dr. Colin McRae. He found that she was in a "very highly nervous state, extremely agitated," there was "some tenderness in her neck and contusions about the nose and mouth,"

"strain of scalenus muscle on the left and question of possible injury to cervicle vertebrae," and his impression was that the scalenus muscles, which connect the spinal column in the neck to the ribs, were strained on the left side. She was not unconscious. He told her to take a sedative and to go home and consult her family physician.

She, in describing her injuries, said: "I was thrown up in the back of the taxicab and then forward, and when I looked around there I was lying in the bottom of the taxicab. * * * The skin was taken off my nose, back of my head was hit, and the pains were terrific. I think, when I was thrown forward, I came down on my face and hit the chauffeur's seat and skinned my nose and my lip and my chin. * * * I would say that it hit the top of the taxi. * * * I was taken out and put in a machine and taken to the hospital. "Q. Well now, what did you feel immediately after the accident? A. Well terrific pain in the head, and my nose was very sore and very painful, and my back hit, left arm and even my shoulder, the pain. I had never had such pain in my life."

After her examination by Dr. McRae, Mrs. Monaghan was taken to her home, and Dr. Henry Cassidy, her family physician, summoned. When she reached her home, she was, she said, suffering intensely, she was "getting worse all the time," and the pains were very intense, she was nauseated, and had "terrific pains in the head" and "the hit in the back got worse." The accident happened on Saturday, on the following Tuesday she went to the Mercy Hospital for an X-ray examination, and on the following Friday she was again taken to the same hospital and remained there eight days. The hospital charges were $69, and Dr. Cassidy charged her $117 for his services rendered in connection with her injuries.

Dr. Cassidy examined her "towards dusk" on the day of the accident. He found her shocked, rather dazed, bruised, suffering intense pain, that she said her back at the junction of the spine and the pelvis bone hurt her, that she had what appeared to him to be a partial dislocation

of the fifth "cervicle vertebrae," that she was not hysterical, her answers to questions were responsive and sensible, but that she complained that "the pain was killing her," that she seemed dazed and not absolutely herself.

While Mrs. Monaghan was at the hospital she was visited by Henry M. Wilbourne, an insurance adjuster for an insurance company that had insured Blinder, who, he said, was a member of the Diamond Taxicab Organization. He said he was there in response to a call, that the hospital authorities wanted him to send a person who had been injured to "our doctor." As he finished arranging for that, he said a nurse came in and told him that another "cab accident" had been brought into the hospital, she thought a Diamond cab. He went into the "accident room" and saw Mrs. Monaghan and Mr. Patterson, and inquired "how they felt," which, he said, "would be the normal situation," He did not know either of them, and it may be inferred that his intrusion upon them was in pursuance of a plan to prevent any future claim for damages against his company. On his cross-examination he gave this testimony:

"Now, when you came to see Mrs. Monaghan, did you then come to see her to find out how she was or get this case settled? A. I honestly went there to see how she was. Q. You brought form releases? A. Yes, sir. Q. And checks with you? A. Yes, sir, I always carry my brief case with me. Q. You think very often you can get these cases settled quickly after an accident? A. It is always our purpose to get these small cases out of the way. Q. You like to get them out of the way before a party has a chance to employ their own attorney? A. I don't think that is entirely fair."

While he was at the hospital, he told Mrs. Monaghan that he would see her that afternoon. He called at her home at 4:30 or 5 o'clock, and immediately began negotiations for a release of any claim she might have against Blinder. Wilbourne's version of what took place then and that of Mrs. Monaghan differ. She testified:

"I remember him sitting at the desk and saying that he was going to give me fifty dollars. He said I am going to give you fifty dollars. Had he said five dollars, it wouldn't have made any difference to me. Q. What did you say when he said he would give you fifty dollars? A. I said Yes, because it wouldn't have made any difference to me. * * * Well he had papers there, and then he came over—I wasn't able to move—and he said, You sign here. I had no glasses. I told him that I couldn't sign unless I had a lawyer, and he said, if your lawyer—your lawyer would take all I am giving you; and I signed without glasses. I hadn't glasses on at the time. I was in great agony, and not only that, he put his arm back of me and raised me up so I could sign the paper. Q. Did he tell you what the paper was? A. He did not. Q. Did you read the paper? A. I did not, no. He didn't explain it. I didn't read it nor did he explain it. I was in too much agony at that time. I didn't seem to understand what it was all about. I was in a dazed condition from agony and pain. * * * Q. Did he say anything about reading the paper? A. No, he didn't. He said, Sign here, and then he stood up and got another paper and brought it back. I said, What is this, and he said 'Just like the other one.' "

The two papers were identical releases, except that one was witnessed by Wilbourne and the other by Mrs. Patterson. Wilbourne said that Mrs. Monaghan suggested the amount, and also five dollars for her medical attention, but he admitted that he did not read the papers to her, that he did not know that she read them, that he did not explain them, that he "raised her up to assist her in signing the releases," because she was leaning back, but said that she said nothing about her glasses, and that he said nothing about her own lawyer "taking all of the money." After the releases were signed he left the checks with her and she sent them to her lawyer. There is nothing in the record to indicate what became of them, but it may be inferred, in the absence of any objection by the appellants, that they were returned or tendered to them.

The circumstances surrounding the obtention of these releases is in complete harmony with the atmosphere which so often surrounds the prosecution and defense of claims for personal injuries under modern conditions.

The appellee was taken to one of the largest and most widely known hospitals in the city. There the insurance adjuster who procured the releases followed her into the accident room, and, having discovered who she was, announced that he would call on her that afternoon. He did call, equipped with checks and releases, and in fifteen minutes, according to his own statement, had concluded a settlement with a woman who was suffering intense pain, dazed, and in such a condition that he found it necessary to hold her up while she signed the releases. He knew she had a lawyer, but not only did fail to suggest that she consult him, but told her that if she did, the lawyer, whose name he said he did not know, would take all the money. He said he did not tell her that, but the conflict was for the jury. Under such circumstances, it cannot be said as a matter of law that the transaction was free from the taint of fraud, or that she was mentally capable of understanding its nature and effects. Indeed, the possibility of fraud in negotiating such a release under such circumstances is so patent that the Legislature, by chapter 38, Acts 1936 (Ex. Sess.), provided that all releases of claims for injuries resulting from a tort executed within two days "of the infliction of said injuries" shall be voidable within sixty days at the option of the injured party.

There was no suggestion that the appellee was mentally deranged, in the sense that she was afflicted with any mental disease, but her contention was that her mind was in such a disordered state as the result of shock and pain that she was incapable of understanding the nature, effect, and consequence of the paper she was called upon to sign, and as there was in the record evidence sufficient to support that contention, appellants' F prayer was properly refused, because it was misleading. It was impossible to separate the appellee's mental condition from the

issue of fraud in procuring the release. The issue was not solely one of mental capacity, but of fraud which involved mental capacity as one of its ingredients. The charge was that she was hurried into signing the papers at a time when she was dazed, or to use the synonyms of that word, stupefied and bewildered, when she was suffering from shock and intense pain, which may well have affected her ability to understand what she was doing. In dealing with fraud, the jury were entitled to consider her mental state as affected by her physical injuries, and if they believed that she was stupefied and bewildered, in intense pain and suffering from shock, to consider that in connection with the other circumstances attending the transaction. It is true the court instructed the jury that there was no legally sufficient evidence of fraud, but, in so ruling, it gave the appellants more law than they were entitled to have, for upon the record it cannot be said as a matter of law that the release was not procured by fraud. The haste in pursuing the injured woman to her home, and in consummating the transaction, the disregard of her pain and suffering, the insistence upon going through with the work in hand, although she was obviously dazed and shocked, the necessity of physically supporting her when she signed the release, discouraging her from seeking legal advice when she said she could not sign unless she had a lawyer, were all evidence which, when taken in connection with her mental state, was sufficient to permit an inference of fraud. To have instructed the jury, under those circumstances, that there was no legally sufficient evidence to show that the appellee was, when she executed the releases, "incapable on account of her mental condition" to execute a valid deed or contract, was misleading and confusing, because the jury may reasonably have understood it to mean that they could not consider it at all.

On facts strikingly similar, in *Western Maryland Dairy Corporation v. Brown*, 169 Md. 257, 181 A. 468, it was held that the validity of a release of the same character as that in issue here was properly submitted to a jury.

After reciting the facts, in the opinion in that case it is said: "With these facts and under these circumstances, we can reach no other conclusion or impression than that there was legally sufficient evidence that she was hurried into signing a release without an opportunity to appreciate and understand the nature, effect, and consequences of her act, possibly influenced by the declaration of the agent, Kaiss, that there was no liability of the cab company to release. * * * It may also be said, as it was in *Atchison, T. & S. F. Ry. Co. v. Cunningham,* 59 Kan. 722, 727, 54 P. 1055, 1057: 'Taking the testimony offered by the defendant in its most favorable aspect, the settlement was made at such a time, under such conditions, and on such terms that condemn it as a fraud and imposition.'"

In 53 *C. J.* 1209, it is said: "Mental incapacity or incompetence sufficient to render a release avoidable may result from disease or physical injury, nervous shock, the use of opiates, or physical or mental pain. To render a release void on this ground, it should appear that the releasor did not possess at the time of the execution of the release sufficient understanding to know the nature of the act and its effect, or carefully to consider his rights; and inability of the releasor carefully to consider his rights has been held sufficient, without the establishment of mental incompetency." In a note to that text it is added that "Undue haste (1) in securing a release from the person still suffering from a recent injury may cast suspicion on the validity of the release (*Orr v. Missouri Pac. R. Co.,* 98 Kan. 120, 157 P. 421; *Atchison etc. R. Co. v. Peck,* 79 Kan. 413, 100 P. 54; *Jones v. Alabama etc. R. Co.,* 72 Miss. 22, 16 So. 379; *Alabama & V. R. Co. v. Jones,* 73 Miss. 110, 19 So. 105; *Girard v. St. Louis Car Wheel Co.,* 46 Mo. App. 79; *McGrail v. Jersey Cent. Tract. Co.,* 84 N. J. Eq. 261, 94 A. 81) ; (2) and should not be encouraged or judicially approved (*Orr v. Missouri Pac. R. Co.,* 98 Kan. 120, 157 P. 421)." And it has also been held that mental or physical weakness or suffering will be

considered, along with other circumstances, in determining whether the transaction is tainted with fraud. *Id.* 1224.

Finding no reversible error in the rulings involved in the exceptions submitted for consideration on this appeal, the judgment of the trial court will be affirmed.

*Judgment affirmed, with costs.*

URNER, J., concurs in the conclusion.